# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF NEW YORK

JAMES ANTHONY MAENZA,

Plaintiff,

v.

CAROLYN W. COLVIN,

Defendant.

**DECISION & ORDER**
14-CV-6596

## Preliminary Statement

Plaintiff James Anthony Maenza ("plaintiff") brings this action pursuant to Title II of the Social Security Act seeking review of the final decision of the Commissioner of Social Security ("the Commissioner") denying his applications for disability insurance benefits.   See Complaint (Docket # 1).   Presently before the Court are the parties' competing motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.   See (Docket ## 9, 10).

## Background and Procedural History

On May 15, 2011, plaintiff applied for disability insurance benefits, alleging a disability onset date of January 15, 2011. Administrative Record ("AR.") at 168.   On October 7, 2011, plaintiff received a Notice of Disapproved Claim and timely filed a request for a hearing before an Administrative Law Judge ("ALJ").   AR. at

87-93.  On January 14, 2013, a hearing was held before ALJ John P.

Costello.  AR. at 35-40.  At the hearing, plaintiff informed the ALJ

that he had not yet obtained counsel and the ALJ adjourned the hearing

to allow him time to secure representation.  Id.  On March 5, 2013,

plaintiff reappeared before ALJ Costello with his attorney, Justin

M. Goldstein.  AR. at 41-78.  Julie Andrews, a Vocational Expert,

also testified at that hearing.  Id.  On June 24, 2013, the ALJ

issued a decision finding plaintiff not disabled under sections

216(i) and 223(d) of the Social Security Act.  AR. at 12-26.  On

August 21, 2013, plaintiff timely filed a request for review of the

ALJ's decision by the Appeals Council.  AR. at 10.  On August 23,

2014, the Appeals Council denied review of the ALJ's decision and

it became the final ruling of the defendant Commissioner.  AR. at

1—3.  This federal lawsuit followed.

## Medical History

Though plaintiff alleges a disability onset date of January 15,

2011, the sources of that claim date back over a decade.  AR. at 168.

In the 1990's, plaintiff was in an automobile accident that injured

his lower back.  AR. at 779.  He had surgery on his left knee in 1988,

and two arthroscopic surgeries on his right knee roughly a decade

later.  Id.  More recently, in January 2010, plaintiff suffered a

shoulder injury while working at the Flower City Tissue Mill.  AR.

2

at 681.  Id.  Roughly a year later, he lost his job.  AR. at 711. Plaintiff then filed a disability claim, alleging a disability onset date of January 15, 2011 due to depression; panic attacks; and knee, back, and shoulder pain.  AR. at 570.

On February 12, 2011, plaintiff underwent a lumbar spine X-ray that revealed mild degenerative changes to his lower back.  AR. at 1059.  On February 15, 2011, plaintiff visited Dr. John E. Klibanoff, M.D., for a compensation disability examination of his left shoulder injury.  AR. at 681.  Dr. Klibanoff noted that plaintiff was unemployed for reasons unrelated to his shoulder, but observed that he was still approximately 15% impaired.  Id.  Dr. Klibanoff concluded that plaintiff didn't need surgery, but recommended medication and physical therapy.  Id.  Later, on February 24, 2011, the Workers' Compensation Board requested that Dr. Steven Hausmann, M.D., examine plaintiff.  AR. at 711.  Aside from his shoulder impairment, Dr. Hausmann noted that plaintiff's past medical history revealed low back pain and knee pain.  Id.  On examination, Dr. Hausmann concluded that plaintiff had a partial thickness rotator cuff tear with persistent pain and that he had reached maximum medical improvement.  AR. at 712.  He further concluded that physical therapy would no longer benefit plaintiff, and remarked that his left shoulder condition was "mild enough to allow a schedule loss of use" of 27.5%.  AR. at 712-13.

3

On March 3, 2011, plaintiff saw RPA-C David A. Terp for chronic lower back pain that had intensified three days prior.   AR. at 1061. RPA-C Terp observed tenderness over the spine and limited forward flexion, and recommended that plaintiff practice stretching.   Id. He also prescribed plaintiff Ultram for his pain.   Id.

In June and July of 2011, plaintiff was treated for depression and substance abuse issues.   He received in-patient rehabilitation at Clifton Springs Crisis Center from June 24 to July 1 after he went to a doctor for chest pains following an alleged drug binge.   AR. at 793-803.    On July 7, 2011, plaintiff underwent emergency treatment for crack-cocaine dependency, depression, and anxiety at Unity Hospital.   AR. at 794, 853.

On July 15, 2011, plaintiff visited Eastside Medical Urgent Care, complaining of left shoulder pain.   AR. at 1246.   Dr. Tahmtan Hormozdyaran, M.D., noted that his shoulder appeared tender and he was unable to lift his arm above his head.   AR. at 1246-47.   Dr. Hormozdyaran concluded that plaintiff was operating at a 25% temporary impairment level and prescribed him pain medication.   AR. at 1246.    That same day, plaintiff went to Rochester General Hospital's Emergency Department complaining of chronic left shoulder pain.   AR. at 864.   His visit notes indicate that he had a painful range of motion in his left shoulder, but that his complaints were disproportionate to the examination's results.   AR. at 864.

4

Plaintiff's girlfriend expressed concern that he was addicted to his medication, informing physicians that he consumed four hundred pills in two weeks. AR. at 865. That same day, plaintiff was admitted to the Rochester General Hospital for an emergency psychiatric evaluation after his girlfriend revealed that he was abusing drugs and expressing violent and suicidal ideations. AR. at 861. She said that plaintiff forced her to fake injuries in order to get pain medication that he would take from her. AR. at 752. After being admitted to the Rochester General Hospital, plaintiff was diagnosed with poly-substance dependence, depression, and shoulder and joint pain. AR. at 863.

On August 10, 2011, Dr. Karl Eurenius, M.D., conducted a consultative examination of plaintiff at the request of the Division of Disability Determination. AR. at 779. Plaintiff complained of sore knees, a sore back, and a sore left shoulder. Id. He reported two arthroscopic surgeries on his right knee and open surgery on his left knee. Id. He claimed that he tore his left rotator cuff in 2011, and that it hurt when he carried or lifted objects. Id. Plaintiff also claimed that he stopped drinking alcohol in 2007, stopped using marijuana in 1984, and stopped using cocaine in 2010. Id. Plaintiff said that he was able to cook, clean, do laundry, shop, and shower. AR. at 780. He also reported that he liked to watch television, listen to the radio, go to the store, and bowl. Id. Dr.

5

Eurenius described plaintiff's gait as normal but noted that he had a limited squat due to bilateral knee and lower back pain. Id. Dr. Eurenius reported that plaintiff had full range of motion in his arms except for elevation of the left shoulder, and full range of motion in his hips, knees, and ankles. Id. Ultimately, Dr. Eurenius diagnosed plaintiff with chronic low back pain, bilateral arthritis of the knees, and a recent tear of the left rotator cuff. Id. These impairments, Dr. Eurenius continued, made it difficult for plaintiff to sit, stand, or walk for prolonged periods of time and to lift and carry objects, especially with his left arm. AR. at 781-82. Dr. Eurenius also opined that plaintiff was limited in climbing or descending stairs and walking on uneven ground. AR. at 782.

On the same day, plaintiff underwent a consultative psychiatric examination conducted by Dr. Kavitha Finnity at the request of the Division of Disability Determination. AR. at 775-78. Plaintiff said that he was recently hospitalized following a panic attack, and that he had difficulty sleeping and maintaining a normal appetite. AR. at 775. Plaintiff also reported depressive symptoms, including dysphoric mood, feelings of hopelessness, loss of energy, crying, and irritability. Id. He claimed to have recurrent suicidal ideations and frequent anxiety. Id. Plaintiff described a history of substance abuse: he abused alcohol from 1984 to 2007, he abused marijuana from 1983 to 1984, and he used cocaine from 1990 to 2010.

6

Id. at 776.

On examination, Dr. Finnity observed that plaintiff's gait and appearance were normal, that his thought process was coherent, and that his judgment was fair.   AR. at 776-77.   Dr. Finnity also observed that his affect was depressed and his recent and remote memory skills were mildly impaired.   Id.   Plaintiff claimed to dress, bath, and groom himself, as well as cook, clean, and do laundry.   Id.   Dr. Finnity concluded that plaintiff could "follow and understand simple directions" and could "learn new tasks and perform complex tasks."   AR. at 777.   She also found that plaintiff had "some difficulty" with attention, concentration, relating to others, and dealing with stress, but could maintain a regular schedule and make appropriate decisions.   Id.   Dr. Finnity diagnosed plaintiff with major depressive disorder, panic disorder, cocaine abuse in remission, alcohol abuse in remission, marijuana abuse in remission, and chronic pain.   Id.   Dr. Finnity found that his prognosis was fair, but noted that it would improve with chemical dependency and psychiatric treatment.   AR. at 778.

Plaintiff went to several urgent care facilities in August and September of 2011.[1]  At each facility, plaintiff complained of left

---

[1] On August 15, 2011, plaintiff went to Rochester Immediate Care. AR. at 1232.   On September 6 and September 12, 2011, plaintiff went to Eastside Medical Urgent Care.   AR. at 1236, 1244.   Three days

shoulder pain, and practitioners diagnosed him with some from of left shoulder injury and prescribed him Tramadol.   AR. at 1232, 1236, 1244, 1266, 1367-68.

On September 26, 2011, Dr. Matthew Tomaino, M.D., examined plaintiff's left shoulder.   AR. at 1367.   Plaintiff complained of left shoulder pain and partial thickness tearing in his rotator cuff. Id.   On examination, Dr. Tomaino observed that plaintiff had full range of motion in his left shoulder but a positive Hawkins' sign above ninety degrees.   Id.   Based on plaintiff's radiographs, Dr. Tomaino determined that he had type II acromion, slight changes at the greater tuberosity, and some A-C arthrosis.   Id.   Dr. Tomaino expressed interest in conducting a left shoulder arthroscopy and anterior acromioplasty, and noted that plaintiff was 100% temporarily impaired.   AR. at 1367-68.

On October 6, 2011, a state agency reviewing psychiatrist, Dr. R. Altmansberger, filled out a Psychiatric Review Technique Form and conducted a Mental Residual Functional Capacity ("RFC") Assessment of plaintiff.   AR. at 829-31.   Dr. Altmansberger noted that plaintiff had no limitations remembering locations and work-like procedures, understanding and remembering very short and simple instructions, carrying out very short and simple instructions,

_____

later, on September 15, 2011, plaintiff went to Unity Hospital Emergency Hospital.   AR. at 1266.

sustaining an ordinary routine without special supervision, or making simple work-related decision.    AR. at 829-31.  Plaintiff would, however, have mild limitations understanding and remembering detailed instructions; and moderate limitations carrying out detailed instructions, maintaining attention and concentration for extended periods, performing activities within a schedule, maintaining regular attendance and being punctual, and working in coordination with or proximity to others without being distracted. AR. at 829.  Dr. Altmansberger also determined that plaintiff would have moderate limitations completing a normal workday without interruptions from his psychologically-based symptoms, interacting with the general public, accepting instructions and responding to criticisms, responding to changes in work settings, and travelling to unfamiliar places.  AR. at 830.  Based on a review of plaintiff's medical history, Dr. Altmansberger concluded that plaintiff had the ability to maintain attention and concentration for an eight hour work day with only moderate limitations related to his anxiety and depression, and "the ability for simple work in a low contact environment."  Id.

On October 20, 2011, Dr. Hausmann reexamined plaintiff.  AR. at 1251.  Dr. Hausmann noted that plaintiff exacerbated his shoulder injury by lifting laundry in July 2011.  AR. at 1252.  As a result, Dr. Hausmann reported reduced range of motion in plaintiff's left

9

shoulder and increased pain, rendering his disability moderate.   Id.

On February 3, 2012, plaintiff saw Dr. William R. Morehouse for
his lower back pain, shoulder injury, and substance abuse problems.
AR. at 1186.  Plaintiff reported that his lower back injury caused
spasms and shooting nerve pain, and that it was exacerbated less than
once a year.  Id.  Dr. Morehouse prescribed plaintiff Ultram for his
pain, Neurontin for his back, and Effexor for his mental health
issues.  Id.  On February 10, 2012, plaintiff returned to Dr.
Morehouse for a more comprehensive exam.  AR. at 1187.  Plaintiff
reported that he had moderate arthritis in both knees and that he
struggled with rage, depression, and anxiety.  Id.  On examination,
Dr. Morehouse observed that plaintiff presented with moderate back
pain when resting, and severe pain when moving.  Id.  He noted
tenderness in the para-spinal muscles, but otherwise normal rotation
and flexion.  Id.  Dr. Morehouse determined that plaintiff's knee
pain was adequately compensated and prescribed him Abilify and
Neurontin.   AR. at 1188.   At a February 24, 2012 follow-up
appointment, plaintiff commented that the Neurontin somewhat helped
his back, but complained of depressed mood, anxiety, and
irritability.  AR. at 1189.  On March 1, 2012, Dr. Morehouse learned
that plaintiff had obtained multiple prescriptions for pain
medication and cancelled his prescription.  AR. at 1191.  Dr.
Morehouse said that plaintiff's substance abuse remained unchanged

10

and expressed concern about treating his lower back with pain medication. AR. at 1192.

On March 7, 2012, plaintiff complained of left shoulder pain, depression, and anxiety to Dr. Morehouse. AR. at 1193. On examination, plaintiff had restricted movement and tenderness in his shoulder and mild pain in his back when moving. Id. Dr. Morehouse concluded that plaintiff's substance abuse and depression had become controlled, but noted that his shoulder injury may "be an AC joint and deltoid tendon problem." AR. at 1194. On March 12, 2012, plaintiff went to Unity Hospital's Emergency Department complaining of left shoulder pain. AR. at 1260. The practitioners concluded that plaintiff suffered from rotator cuff syndrome. AR. at 1261.

On March 22, 2012, plaintiff was taken to Rochester General Hospital's Psychiatric Department after expressing suicidal ideations during a fight with his brother. AR. at 845-47. Plaintiff appeared normal and hospital notes indicate that he was diagnosed with depression. AR. at 845-48.

On April 10, 2012, plaintiff had a follow-up appointment with Dr. Morehouse. AR. at 1195-96. He complained of depression, nightly restless leg syndrome, and shoulder pain that bothered him most nights. Id. Dr. Morehouse advised plaintiff to continue taking his medication. Id.

On April 26, 2012, plaintiff began a chemical dependence

11

treatment program at Unity Health System. AR. at 1111. At the evaluation, plaintiff remarked that he lost his job after taking time off for family court appearances. AR. at 1116. Plaintiff was discharged from the program in October 2012. AR. at 1162.

On May 4, 2012, plaintiff saw Dr. Tomaino for his left shoulder. AR. at 1356. Plaintiff said that his pain was aggravated by reaching, and his MRI indicated partial tearing. Id. Dr. Tomaino noted that plaintiff's shoulder demonstrated mild tenderness but that he had full range of motion and was not at all temporarily impaired. AR. at 1356-57.

On May 17, 2012, Dr. Tomaino performed arthroscopic surgery on plaintiff's left shoulder. AR. at 1348. Dr. Tomaino noted that plaintiff had abundant bursitis but that the surgery produced no complications. Id. During a May 23, 2012 post-operation evaluation, Dr. Tomaino noted that plaintiff should stay on disability and return in six weeks. Id. On May 30, 2012, plaintiff attended physical therapy. AR. at 1073. He reported a constant throbbing pain that felt better when iced. Id. On examination, the therapist noted that plaintiff had decreased range of motion and strength in his left shoulder and advised him to attend weekly physical therapy sessions. AR. at 1074. Plaintiff attended physical therapy until December 6, 2012. AR. at 1074-89.

On July 6, 2012, Dr. Tomaino noted that plaintiff was

12

"improving, albeit slowly." AR. at 1340. Dr. Tomaino also noted that plaintiff was 100% temporarily disabled. AR. at 1341.

On August 8, 2012, Dr. Morehouse described plaintiff's recovery through physical therapy as "excellent." AR. at 1198. However, on August 17, 2012, plaintiff visited Dr. Tomaino and reported pain in his right shoulder that was aggravated by raising his arm above his head. AR. at 1333. Dr. Tomaino opined that plaintiff had developed "a consequential case of right shoulder impingement." AR. at 1134. He recommended that plaintiff's right shoulder impairment be included in plaintiff's workers' compensation claim and marked him as 50% temporarily impaired. Id.

On September 4, 2012, plaintiff returned to Dr. Morehouse's office and complained of depression, anxiety, insomnia, and increased back pain. AR. at 1200. Dr. Morehouse prescribed plaintiff additional medication for his depression and advised him to return in two weeks. AR. at 1201. On September 18, 2012, plaintiff returned and reported that he was still struggling with depression and anger issues. AR. at 1202. Dr. Morehouse increased plaintiff's medication. AR. at 1202-03.

On September 28, 2012, Dr. Tomaino examined plaintiff and noted only mild tenderness over his right shoulder. AR. at 1329. Dr. Tomaino also noted that plaintiff's left shoulder was steadily improving and that he no longer needed formal therapy. AR. at 1330.

13

On October 10, 2012, Dr. Morehouse completed a medical source statement on plaintiff's ability to complete work-related activities.  AR. at 997-1002.  Dr. Morehouse said that plaintiff could only occasionally lift and carry up to ten pounds and could never handle more weight than that.  AR. at 997.  Dr. Morehouse also opined that he could sit for "20+" minutes and stand and walk for twenty minutes at a time, meaning that, in an eight-hour work day, plaintiff could sit for a total of four hours and stand and walk for a total of two hours each.  AR. at 998.  He noted that plaintiff could occasionally balance but could never climb stairs, ramps, ladders, or scaffolds and could never stoop, kneel, crouch, or crawl.  AR. at 1000.   Dr. Morehouse also noted that plaintiff could: never be exposed to unprotected heights or extreme cold; occasionally be exposed to moving mechanical parts, operating a motor vehicle, humid and wet environments, and extreme heat; and frequently be exposed to dust, odors, fumes, and pulmonary irritants, and vibrations.  AR. at 1001.  Dr. Morehouse found that plaintiff could be exposed to moderate noise.  Id.  Dr. Morehouse also concluded that plaintiff could not walk a block at a reasonable pace on rough or uneven surfaces, and could not use standard public transportation.  AR. at 1002.  Finally, Dr. Morehouse noted that severe anger issues would impair plaintiff's ability to work with a supervisor or others.  Id. These impairments, Dr. Morehouse estimated, began in February 2010

14

and continued for twelve consecutive months.  Id.

Plaintiff underwent a mental health evaluation on October 16, 2012 conducted by Amy Rosechandler. AR. at 1095-1105.  Plaintiff admitted to having family, drug, and alcohol problems dating back to 2011.  AR. at 1096.  He said that he went bowling once a week and that he routinely cooked.   Id.  He also said he was fired from his last job for taking too much time off to attend family court proceedings.    AR. at 1101.    On examination, MS Rosechandler diagnosed plaintiff with an anxiety disorder, major depressive disorder of mild severity, and another unspecified personality disorder.  AR. at 1095.

On October 17, 2012, plaintiff saw Dr. Morehouse for depression, anxiety, knee pain that prevented him from standing or walking for more than twenty minutes, and chronic back pain. AR. at 1204.  On November 9, 2012, plaintiff saw Dr. Tomaino for pain in his right shoulder.  AR. at 1325.  Though concerned about his right shoulder, Dr. Tomaino noted that plaintiff's left shoulder was doing objectively well and that he had no temporary work-related impairments. AR. at 1326.

On November 27, 2012, Dr. Morehouse discovered that plaintiff's right knee had marked crepitus and plaintiff's left knee had mild crepitus.  AR. at 1206.  Dr. Morehouse remarked that the issue appeared moderately compensated but expressed interest in pursuing

additional remedies.    AR. at 1207.    On December 21, 2012, Dr. Tomaino noted that plaintiff was at maximum improvement for his left shoulder and that his objective exam results were "superb."   AR. at 1321-22.    Overall, Dr. Tomaino concluded that plaintiff had a 10% loss of use of his left arm.   AR. at 1322.

On January 8, 2013, Dr. Hossein Hadian, M.D., examined plaintiff.   AR. at 1369.   Plaintiff complained of discomfort in his left shoulder that was aggravated by movement.   Id.   On examination, Dr. Hadian concluded that plaintiff had no abnormalities with his right shoulder and minor range of motion limitations in his left shoulder.   Id.   Dr. Hadian diagnosed plaintiff with unspecified myalgia and myositis.   AR. at 1370.

On January 10, 2013, at the request of the Workers' Compensation Board, Dr. Hausmann conducted an independent orthopedic surgery examination of plaintiff.   AR. at 1371.   Plaintiff complained of pain in his right shoulder associated with movement and diminished left shoulder pain.   Id.   After examining plaintiff, Dr. Hausmann concluded that he suffered from left shoulder arthroscopic decompression for impingement with associated labral debridement and right shoulder pain with evidence of internal derangement.   AR. at 1372.   Describing his disability as mild and causally related, Dr. Hausmann recommended that plaintiff avoid repetitive overhead lifting with either arm, but noted that plaintiff could lift without

16

restrictions to waist height. Id. On February 20, 2013, Dr. Morehouse recommended that plaintiff avoid work requiring regular bending, lifting, or walking, and prohibited him from climbing or squatting. AR. at 1213.

On April 10, 2013, Dr. Morehouse completed a physical RFC questionnaire concerning plaintiff. AR. 1375-79. Dr. Morehouse diagnosed plaintiff with traumatic arthritis, major depression, and anxiety, and described his prognosis as fair. AR. at 1375. He noted that plaintiff experienced daily pain in his back, shoulders, and knees, and opined that plaintiff's depression and anxiety required him to work low stress jobs. Id. Dr. Morehouse also indicated that plaintiff could only walk a half-block without rest or severe pain, and could only sit and stand for thirty minutes at a time. AR. at 1376. In an eight-hour work day, Dr. Morehouse continued, plaintiff could only sit and stand for about four hours total, and would have to take a ten minute walk every thirty minutes. AR. at 1377. He noted that plaintiff could never lift anything weighing fifty pounds, and should only occasionally lift objects weighing ten pounds or less. Id. Moreover, plaintiff could never crouch, squat, or climb stairs or ladders. AR. at 1378. Dr. Morehouse estimated that plaintiff would have to miss approximately three days per month due to these impairments. Id. Finally, Dr. Morehouse commented that temperature extremes, social situations, and anger management issues

17

would all affect plaintiff's ability to work regularly.   AR. at 1379.

## Hearing Testimony

Testimony of Plaintiff:   On   January   14,   2013,   plaintiff appeared before ALJ John P. Costello, but the ALJ adjourned the hearing to allow plaintiff to obtain counsel.   AR. at 35-40. Plaintiff reappeared before the ALJ on March 5, 2013, this time represented by Justin Goldstein.   AR. at 41-78.   Goldstein testified that plaintiff suffered from both mental and physical impairments: namely, chemical dependency; anxiety; and pain in his knees, shoulders, and lower back.   AR. at 45-46.   Goldstein further testified that plaintiff's primary care physician, Dr. Morehouse, provided a medical source opinion stating that plaintiff could lift no more than ten pounds; could never lift frequently; and could only sit, stand, and walk for twenty minutes at a time.   Id.

Next, plaintiff testified that he was a forty-seven-year-old high school graduate who was divorced but living with his girlfriend. AR. at 48, 574.   Plaintiff testified that he was employed full-time for roughly three years by the Flower City Tissue Mill as a machine tender.   AR. at 49.   As part of that job, plaintiff lifted machine parts weighing approximately 100 pounds. AR. at 49-50.   Plaintiff claimed that he was fired after he took too much time off. AR. at 49-50.

18

Prior to the Flower City Tissue Mill, plaintiff said that he worked for a year at Premier Signs, where he fixed and painted signs. AR. at 50-51.   There, plaintiff lifted objects weighing between fifty and 100 pounds.   AR. at 51-52.   Plaintiff testified that he also worked at K. D. Supply, where he put fittings on hydraulic hoses and lifted objects weighing approximately fifty pounds.   AR. at 52. Prior to K. D. Supply, plaintiff worked jobs he obtained through a temporary job agency, including a position making paper bags.   AR. at 53.   Plaintiff also worked at Kodak for eight years, where he perforated camera film.   AR. at 53-54.   At these jobs, he lifted objects weighing between forty and 100 pounds.   Id.   In 2002, plaintiff delivered wine and liquor for a liquor distributor.   AR. at 55, 579.   As part of that job, plaintiff drove a four-wheel truck and lifted objects weighing more than fifty pounds.   AR. at 56.

Plaintiff also testified about his disabling impairments.   In particular, plaintiff explained that his shoulder, knee, and lower back injuries were the most serious.   AR. at 57.   He said that he had surgery on his left shoulder in 2012 that prevented him from raising his left arm above shoulder-level and lifting objects weighing more than ten pounds.   AR at 57-59.   Though he had not had surgery on his right shoulder, he maintained that he was unable to lift objects weighing more than twenty pounds with his right arm. Id.   With respect to his knees, plaintiff claimed that the pain

19

prevented him from easily standing up, walking long distances, squatting, kneeling, climbing stairs, and standing for long periods of time. AR. at 60. Plaintiff testified that he could only stand, sit, or walk for approximately twenty minutes at a time before it became painful. Id. Finally, as to his lower back, plaintiff claimed that he suffered pain getting out of bed in the morning and after sitting or standing for periods of time. AR. at 62-63. For the pain, plaintiff stated that he took Tramadol and iced his back for half-hour intervals every day or two. AR. at 63-64.

Plaintiff also testified that he had disabling mental impairments, including severe depression and psychosis. AR. at 64. Relatedly, plaintiff testified that he suffered from social anxiety. AR. at 66. He claimed he had difficulty being around groups of people larger than ten. AR. at 70-71. Plaintiff also testified about his drug and alcohol dependency, stating that he had been sober since November 7, 2011 and regularly attended group therapy. AR. at 67.

Despite these impairments, plaintiff testified that he routinely woke up by 7:00 A.M. and occupied his time by bowling and completing simple household chores like vacuuming, sweeping, doing laundry, and cooking. AR. at 67-69.

Testimony of the Vocational Expert ("VE"): Julie Andrews, a VE, also testified at the hearing. The VE classified plaintiff's past work as: (1) "a paper goods machine set-up operator," a

medium-exertional, skilled position with a specific vocational preparation ("SVP") number of seven; (2) "a sign erector," a medium-exertional, skilled position with an SVP of seven; (3) "a hydraulic repairer," a heavy-exertional, skilled position with an SVP of seven; (4) "a cutter," a light-exertional, unskilled position with an SVP of two; (5) "a light truck operator," a medium-exertional, semiskilled position with an SVP of three; and (6) "a hand packager," a medium-exertional, unskilled position with an SVP of two. AR. at 72-73.

The ALJ next posed a number of hypotheticals for the VE to consider involving an individual of the same age, education, and work experience as plaintiff. First, the ALJ asked if that individual could complete plaintiff's past work if they could: (1) lift or carry no more than ten pounds; (2) sit for a maximum of four hours and stand or walk for a total of four hours; (3) "occasionally balance, but otherwise not engage in postural activity"; and (4) only work in unskilled or semiskilled positions with no exposure to any above-moderate noise, unprotected heights, or extreme temperatures. AR. at 73-74. The VE concluded that the individual would not be able to perform any of plaintiff's past work, but could work as a counter clerk (unskilled position, SVP of two, requiring light exertion, and 108,649 available positions) or a mail clerk (unskilled position, SVP of two, requiring light exertion, and 164,563 available

21

positions). AR. at 74. However, the VE noted that if the individual
could only stand for a maximum of two hours, walk a maximum of two
hours, and sit a maximum of four hours; they could not work as a
counter clerk. AR. at 76.

In his second hypothetical, the ALJ asked about the same
individual from hypothetical one, but additionally limited them to
sedentary work. AR. at 74. The VE claimed that the individual would
be able to work as a brake linings coater (unskilled position, SVP
of two, requiring sedentary exertion, and 990,000 available
positions) or an order clerk (unskilled position, SVP of two,
sedentary exertion, and 255,000 available positions). Id.

In his third hypothetical, the ALJ asked about the same
individual, but added that they should occasionally interact
(including simple proximity) with coworkers, supervisors, and the
general public. AR. at 74-75. Based on this hypothetical, the VE
believed that the individual would be unable to perform work as a
counter clerk or mail clerk, and would have no other available
opportunities for employment. AR. at 75.

Finally, the ALJ asked about the same individual, but added that
they "could have only occasional interaction with coworkers,
supervisors and the general public and speaking of working in
coordination with those individuals when limiting it in this way."
AR. at 75. Under these limitations, the VE concluded that the

22

individual would be able to work in the mail clerk position but not as a counter clerk.  Id.

The VE stated that these positions would generally allow for fifteen-minute breaks in the morning and the afternoon, and a half-hour break at lunch.  AR. at 76.  The VE was unsure whether these positions would allow for an individual to lie down during breaks, but said that they would typically allow for one absence per month.  AR. at 76-77.  However, the VE noted that policies regarding breaks and absences would likely vary by employer.  AR. at 77.

## Determining Disability Under the Social Security Act

The Evaluation Process: The Social Security Act provides that a claimant will be deemed to be disabled "if he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 1382c(a)(3)(A).  The impairments must be "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ."  42 U.S.C. § 1382c(a)(3)(B).

The determination of disability entails a five-step sequential evaluation process:

23

1.   The Commissioner considers whether the claimant is currently engaged in substantial gainful activity.

2. If not, the Commissioner considers whether the claimant has a "severe impairment" which limits his or her mental or physical ability to do basic work activities.

3. If the claimant has a "severe impairment," the Commissioner must ask whether, based solely on medical evidence, claimant has an impairment listed in Appendix 1 of the regulations. If the claimant has one of these enumerated impairments, the Commissioner will automatically consider him disabled, without considering vocations factors such as age, education, and work experience.

4. If the impairment is not "listed" in the regulations, the Commissioner then asks whether, despite the claimant's severe impairment, he or she has residual functional capacity to perform his or her past work.

5.   If the claimant is unable to perform his or her past work, the Commissioner then determines whether there is other work which the claimant could perform. The Commissioner bears the burden of proof on this last step, while the claimant has the burden on the first four steps.

Shaw v. Chater, 221 F.3d 126, 132 (2d Cir. 2000); see also 20 C.F.R. §§ 404.1520, 416.920.   Plaintiff bears the burden of proving his case at steps one through four.   At step five, there is a "limited burden shift to the Commissioner" to "show that there is work in the national economy that the claimant can do."   Poupore v. Astrue, 566 F.3d 303, 306 (2d Cir. 2009) (noting that Commissioner "need not provide additional evidence of the claimant's residual functional capacity"

at step five); see also 20 C.F.R. § 404.1560(c)(2).

When evaluating the severity of mental impairment, the reviewing authority must also apply a "special technique" at the second and third steps of the five-step analysis. Kohler v. Astrue, 546 F. 3d 260, 265 (2d Cir. 2008); see also 20 C.F.R. § 404.1520a(a). First, the ALJ must determine whether plaintiff has a "medically determinable mental impairment." Kohler, 546 F.3d at 265—66; see also 20 C.F.R. § 404.1520a(b)(1). If plaintiff has such an impairment, the ALJ must "rate the degree of functional limitation resulting from the impairment(s)" in four broad functional areas: "(1) activities of daily living; (2) social functioning; (3) concentration, persistence, or pace; and (4) episodes of decompensation." Kohler, 546 F.3d at 266; see also 20 C.F.R. § 404.1520a(c)(3). "[I]f the degree of limitation in each of the first three areas is rated 'mild' or better, and no episodes of decompensation are identified, then the reviewing authority generally will conclude that the claimant's mental impairment is not 'severe' and will deny benefits." Kohler, 546 F.3d at 266; see also 20 C.F.R. § 404.1520a(d)(1). If plaintiff's mental impairment is considered severe, the ALJ "will first compare the relevant medical findings and the functional limitation ratings to the criteria of listed mental disorders in order to determine whether the impairment meets or is equivalent in severity to any listed mental disorder."

25

Kohler, 546 F.3d at 266; see also 20 C.F.R. § 404.1520a(d)(2). If plaintiff's mental impairment meets any listed mental disorder, plaintiff "will be found to be disabled." Kohler, 546 F.3d at 266. If not, the ALJ will then make a finding as to plaintiff's RFC. Id.; see also 20 C.F.R. § 404.1520a(d)(3).

The ALJ's Decision: In applying the five-step sequential evaluation, the ALJ made the following determinations. At the first step, the ALJ found that plaintiff had not engaged in substantial gainful activity since January 15, 2011, the alleged onset date of his disability. AR. at 17. At the second step, the ALJ found that plaintiff had the following severe impairments: arthritis of the knees, lumbar spine, and shoulders; depression; and anxiety. Id. At the third step, the ALJ analyzed the medical evidence and found that, though the plaintiff suffered from severe impairments, he did not have any impairment or combination of impairments that met the listing criteria under the regulations. Id. The ALJ further found that plaintiff had: mild restrictions in activities of daily living; moderate difficulties in social functioning; moderate difficulties with regard to concentration, persistence, or pace; and experienced no episodes of decompensation. AR. at 18. As such, the ALJ found that plaintiff's mental impairments did not meet the listing criteria. Id.

Accordingly, the ALJ moved to the fourth step, which requires

26

determining whether plaintiff has the RFC to perform his past work, notwithstanding his severe impairments.   The ALJ concluded that plaintiff had the RFC to perform light work, with the following limitations:

> lift and carry no more than 10 pounds; change positions briefly every 20 minutes; sit four hours; stand or walk four hours; occasionally balance but otherwise no postural activities; moderate noise level; can understand, remember and follow instructions commensurate with unskilled and semi-skilled work; no work at unprotected heights or extreme cold; and occasional interaction with supervisors, coworkers, and general public.

AR. at 19.   Based on the RFC, the ALJ determined that plaintiff could not perform any past relevant work.   AR. at 24.

Because plaintiff was unable to perform his past work, the ALJ proceeded to the fifth step, which is comprised of two parts.   First, the ALJ assessed plaintiff's job qualifications by considering his physical ability, age, education, and previous work experience.   AR. at 25.   The ALJ next determined whether jobs exist in the national economy that a person having plaintiff's qualifications and RFC could perform.   AR. at 25-6; see also 42 U.S.C. § 423(d) (2)(A); 20 C.F.R. §§ 404.1520(f); 416.920(f).   The ALJ found that the plaintiff was "capable of making a successful adjustment to other work that exists in significant numbers in the national economy" by working as a mail clerk.   AR. at 26.

27

## Standard of Review

The scope of this Court's review of the ALJ's decision denying benefits to plaintiff is limited.   It is not the function of the Court to determine *de novo* whether plaintiff is disabled.   Brault v. Soc. Sec. Admin., Comm'r, 683 F.3d 443, 447 (2d Cir. 2012).   Rather, so long as a review of the administrative record confirms that "there is substantial evidence supporting the Commissioner's decision," and "the Commissioner applied the correct legal standard," the Commissioner's determination should not be disturbed.   Acierno v. Barnhart, 475 F.3d 77, 80-81 (2d Cir. 2007).   "Substantial evidence is more than a mere scintilla.   It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Brault, 683 F.3d at 447-48 (internal citation and quotation marks omitted).   "Even where the administrative record may also adequately support contrary findings on particular issues, the ALJ's factual findings must be given conclusive effect so long as they are supported by substantial evidence."   Genier v. Astrue, 606 F.3d 46, 49 (2d Cir. 2010) (internal quotation marks omitted).

This deferential standard of review does not mean, however, that the Court should simply "rubber stamp" the Commissioner's determination.   "Even when a claimant is represented by counsel, it is the well-established rule in our circuit that the social security ALJ, unlike a judge in a trial, must on behalf of all claimants

28

affirmatively develop the record in light of the essentially non-adversarial nature of a benefits proceeding." Moran v. Astrue, 569 F.3d 108, 112 (2d Cir. 2009); see also Melville v. Apfel, 198 F.3d 45, 51 (2d Cir. 1999) ("Because a hearing on disability benefits is a nonadversarial proceeding, the ALJ generally has an affirmative obligation to develop the administrative record."). While not every factual conflict in the record need be explicitly reconciled by the ALJ, "crucial factors in any determination must be set forth with sufficient specificity to enable [the reviewing court] to decide whether the determination is supported by substantial evidence." Ferraris v. Heckler, 728 F.2d 582, 587 (2d Cir. 1984). "To determine whether the findings are supported by substantial evidence, the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." Mongeur v. Heckler, 722 F.2d 1033, 1038 (2d Cir. 1983). Moreover, "[w]here there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to the correct legal principles." Johnson v. Bowen, 817 F.2d 983, 986 (2d Cir. 1987).

29

## Discussion

Plaintiff challenges the ALJ's decision on two grounds, arguing that: (1) the ALJ erred in weighing the medical opinion of plaintiff's treating physician, Dr. Morehouse; and (2) the ALJ improperly rejected the findings of Dr. Altmansberger, the state agency reviewing physician, that plaintiff could only perform "simple work." See Plaintiff's Memorandum of Law (Docket # 9-1). Both contentions are addressed below.

Treating Physician's Opinion: In   support   of   his   first argument, plaintiff alleges that the ALJ purported to adopt Dr. Morehouse's entire treating physician opinion while inexplicably rejecting portions of it out of hand. Id. at 19-27. To put it differently, plaintiff asserts that the ALJ claimed to give "great weight" to Dr. Morehouse's opinion, but then ignored a number of Dr. Moorehouse's   work-related   opinions   and   limitations   without providing the proper analysis pursuant to well established Second Circuit precedent. Id. Based on the ALJ's opinion and the record as a whole, I agree with plaintiff.

Under the "treating physician rule," an ALJ must afford "a measure of deference to the medical opinion of a claimant's treating physician." See Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004); 20 C.F.R. § 404.1527(d)(2). Accordingly, the opinion of a claimant's treating physician as to the nature and severity of the

30

impairment is given "controlling weight," so long as it "is
well-supported by medically acceptable clinical and laboratory
diagnostic techniques and is not inconsistent with the other
substantial evidence in [the] case record." Burgess v. Astrue, 537
F.3d 117, 128 (2d Cir. 2008) (citing 20 C.F.R. § 404.1527(d)(2));
see also Green-Younger, 335 F.3d 99, 106 (2d Cir. 2003); Shaw v.
Chater, 221 F.3d 126, 134 (2d Cir. 2000).

Moreover, the Social Security Administration is required to
explain the weight it gives to the opinions of treating physicians.
See 20 C.F.R. § 404.1527(d)(2) ("We will always give good reasons
in our notice of determination or decision for the weight we give
your treating source's opinion."). This is true even when the
treating source's opinion is given controlling weight, but
especially true if the opinion is not given controlling weight. See
Burgess, 537 F.3d at 129. The ALJ must consider, inter alia, the
"[l]ength of the treatment relationship and the frequency of
examination; the nature and extent of the treatment relationship;
the relevant evidence, particularly medical signs and laboratory
findings, supporting the opinion; the consistency of the opinion with
the record as a whole; and whether the physician is a specialist in
the area covering the particular medical issues." Id. (internal
quotations omitted) (citing 20 C.F.R. § 404.1527(d)(2)(i)-(ii),
(3)-(5)). "After considering the above factors, the ALJ must

31

comprehensively set forth [his] reasons for the weight assigned to a treating physician's opinion." Greek v. Colvin, 802 F.3d 370, 375 (2d. Cir. 2015) (citing Burgess, 537 F.3d at 129). The failure to provide "good reasons for not crediting the opinion of a claimant's treating physician is a ground for remand." Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999); see also Schaal v. Apfel, 134 F.3d 496, 505 (2d Cir. 1998) ("Commissioner's failure to provide 'good reasons' for apparently affording no weight to the opinion of plaintiff's treating physician constituted legal error.").

Here, the ALJ noted that Dr. Morehouse was plaintiff's treating physician and said that he gave Dr. Morehouse's opinion "great weight." AR. at 22. Without parsing words about the meaning of "great weight" and "controlling weight," it seems clear that the ALJ intended to give Dr. Morehouse's opinion controlling weight under the treating physician rule. Thus, the Court's inquiry turns to whether the ALJ actually gave all of Dr. Morehouse's opinion controlling weight or, as plaintiff suggests, selected only some of Dr. Morehouse's opinions as controlling while unfairly rejecting several of his other opinions and exertional limitations without any explanation.

In support of his point, plaintiff created a chart[2] highlighting

---

[2] See Plaintiff's Memorandum of Law (Docket # 9-1) at 20-23.

several significant limitations from Dr. Morehouse's RFC questionnaire that the ALJ left out of his RFC assessment, namely that: plaintiff was unable to walk more than half a city block without rest or severe pain; plaintiff needed to lie down frequently, take ten-minute walking breaks every thirty minutes, and take two to three ten-minute unscheduled breaks throughout an eight-hour work day; plaintiff's pain would frequently interfere with the attention and concentration needed to perform simple work tasks; plaintiff would need to shift positions from sitting, standing, or walking at will; and plaintiff was unable to work in extreme temperatures and dampness. AR. at 998-1002, 1376-79. A review of the ALJ's decision and the record in this case confirms that, despite claiming to give "great weight" to the opinion of Dr. Morehouse, the ALJ's RFC determination inexplicably lacks any mention or discussion of these limitations. Relatedly, the ALJ failed to include many of these limitations in the hypotheticals he posed to the VE at plaintiff's hearing.

It is beyond dispute that "an ALJ who chooses to adopt only portions of a medical opinion must explain his or her decision to reject the remaining portions." Raymer v. Colvin, No. 14-CV-6009P, 2015 WL 5032669, at *5 (W.D.N.Y. Aug. 25, 2015); see also Younes v. Colvin, No. 14-CV-170, 2015 WL 1524417, at *8 (N.D.N.Y. April 2, 2015) ("When [crediting only portions of a medical source opinion] smacks

33

of 'cherry picking' of evidence supporting a finding while rejecting contrary evidence from the same source, an administrative law judge must have a sound reason for weighing portions of the same-source opinions differently."); Phelps v. Colvin, No. 12-CV-976S, 2014 WL 122189, at *4 (W.D.N.Y. Jan. 13, 2014) ("The selective adoption of only the least supportive portions of a medical source's statements is not permissible." (internal quotations and brackets omitted)); Caternolo v. Astrue, No. 11-CV-6601, 2013 WL 1819264, at *9 (W.D.N.Y. April 29, 2013) ("[I]t is a fundamental tenet of Social Security law that an ALJ cannot pick and choose only parts of a medical opinion that support his determination." (internal citations and quotations omitted)) (collecting cases); Searles v. Astrue, No. 09-CV-6117, 2010 WL 2998676, at *4 (W.D.N.Y. July 27, 2010) ("An ALJ may not credit some of a doctor's findings while ignoring other significant deficits that the doctor identified."); Dioguardi v. Comm'r of Soc. Sec., 445 F.Supp.2d 288, 297 (W.D.N.Y. 2006) ("While the ALJ is not obligated to reconcile explicitly every conflicting shred of medical testimony . . . [t]he plaintiff [] is entitled to know why the ALJ chose to disregard the portions of the medical opinions that were beneficial to [his] application for benefits." (internal quotations and citations omitted)).   This principle carries particular weight here, where the ALJ failed to even mention several of Dr. Morehouse's limitations that would likely impact plaintiff's ability to complete

34

the light work required of a mail clerk.   See Burgin v. Astrue, 348

F. App'x. 646, 649 (2d Cir. 2009) (remanding where ALJ failed to

explicitly consider and explain why portions of a treating

physician's opinion did not receive controlling weight).

Presumably, the ALJ decided not to defer to Dr. Morehouse's opinion

with respect to these limitations.   However, the ALJ's "failure to

accurately represent the opinion of [Dr. Morehouse], or to explain

how he reconciled" Dr. Morehouse's opinion that plaintiff would, for

example, frequently have difficulty maintaining the concentration

needed to perform simple tasks due to his pain with his own RFC

assessment "clearly violates the treating physician rule."   Murphy

v. Comm'r of Soc. Sec., No. 13-CV-0960, 2015 WL 64440, at *11

(N.D.N.Y. Jan. 5, 2015); see also Dioguardi, 445 F.Supp.2d at 295

(remanding where the ALJ "failed to resolve discrepancies between

her RFC and the medical source statements she purportedly assigned

'very great weight'").

    Not only does this failure unnecessarily frustrate the Court's

review, but it suggests that the record may lack substantial evidence

to support the ALJ's conclusion.   See Sachs v. Astrue, 567 F.Supp.2d

423, 431 (W.D.N.Y. 2008) ("[T]he ALJ's finding that plaintiff could

perform other jobs did not incorporate the additional limitations

with respect to lifting, carrying, neck movement and concentration

identified by plaintiff's treating physician, and thus the record

lacks substantial evidence that plaintiff could perform other work during the period in question."). Indeed, with no mention of these limitations and no comprehensive explanation for their absence, the Court finds it difficult "to look to other portions of the ALJ's decision and to clearly credible evidence" to find substantial support for the ALJ's RFC determination. Mongeur v. Heckler, 722 F.2d 1033, 1040 (2d Cir. 1983). After all, as the ALJ ostensibly found, Dr. Morehouse's long-standing treating relationship with plaintiff gave him a uniquely qualified perspective to evaluate the nature and severity of plaintiff's impairments. See AR. at 22. Thus, the ALJ's decision not to discuss several of Dr. Morehouse's proposed limitations in the RFC assessment while simultaneously claiming to give Dr. Morehouse's medical opinion great weight strikes the Court as particularly problematic. See Overbaugh v. Astrue, No. 07-CV-0261, 2010 WL 1171203, at *9 (N.D.N.Y. March 22, 2010) ("Because the ALJ offered no explanation for failing to include the limitations into plaintiff's RFC, the [c]ourt is unable to determine how the ALJ arrived at plaintiff's RFC[;] [t]he ALJ's failure to explain why he disregarded portions of [the doctor's] assessment, while simultaneously assigning it controlling weight, constitutes legal error.").

    The Court does not quarrel with the Commissioner's argument that "the ALJ was entitled to rely on, and adopt only those portions of

36

the opinions that were consistent with the overall record." See
Commissioner's Reply Brief (Docket # 17) at 1.  But an ALJ cannot
feign adherence to the treating physician rule by accepting some of
the treating doctor's findings and simultaneously ignoring other
findings without offering some explanation as to why the latter
opinions were rejected.  "An ALJ may reject a treating physician's
opinion outright only on the basis of contradictory medical evidence,
but may afford a treating physician's opinion more or less weight
depending upon the extent to which supporting explanations are
provided."  Plummer v. Apfel, 186 F.3d 422, 429 (3d Cir. 1999)
(emphasis added).

     It may well be that the ALJ here had good reasons to give less
weight to certain of the opinions of plaintiff's treating physician.
But it is not the role of a reviewing court to speculate what those
reasons might be or to conjure up supporting explanations on its own
accord.    Accordingly,  remand  is  required  so  that  the  ALJ  may
carefully consider all the medical opinions provided by Dr. Morehouse
and follow them should he grant Dr. Morehouse's findings controlling
weight.  Halloran v. Barnhart, 362 F.3d 28, 33 (2d Cir. 2004) ("We
do not hesitate to remand when the Commissioner has not provided 'good
reasons' for the weight given to a treating physicians opinion and
we will continue remanding when we encounter opinions from ALJ's that
do not comprehensively set forth reasons for the weight assigned to

a treating physician's opinion.").

Performance of "Simple Work": With regard to his second point, plaintiff argues that the ALJ erroneously found that plaintiff could perform work outside of the "simple work" limitation suggested by the state agency's physician, Dr. Altmansberger. Plaintiff's Memorandum (Docket # 9-1) at 27-31. The Court disagrees.

In his RFC assessment, Dr. Altmansberger concluded that plaintiff had "the ability for simple work in a low contact environment," AR. at 831, and plaintiff contends that this restriction precludes him from working as a mail clerk. Plaintiff's Memorandum of Law (Docket # 9-1) at 27-31. Plaintiff notes that the ALJ never asked the VE if he could perform simple work, but only if he could perform unskilled or semiskilled work. Id. at 28-29. The ALJ's failure to explain why he made this decision, plaintiff argues, is an important one: plaintiff contends that whether a job is "unskilled" has no bearing on whether a job is "simple". Id. at 29-30. Whether a job is simple, plaintiff continues, is judged through a General Educational Development ("GED") reasoning value; whether a job is unskilled corresponds to an SVP number. Id. Put more precisely, plaintiff believes that a job with a GED reasoning level of three - like mail clerk - is not necessarily a "simple" job. See id. at 30.

In the Second Circuit, at least one court has disagreed with

38

plaintiff's logic and held that a claimant's limitation to simple work comports with a job with a GED reasoning level of three. See Jones-Reid v. Astrue, 934 F.Supp.2d 381, 408-09 (D. Conn. 2012) (citing Carrigan v. Astrue, 2011 WL 4372651 at *10-11 (D. Vt. Aug. 26, 2011)). The Seventh and Eighth Circuits agree. See Terry v. Astrue, 580 F.3d 471, 478 (7th Cir. 2009) (holding that an occupation with a GED level of three does not conflict with plaintiff's ability to only perform simple work); see also Renfrow v. Astrue, 496 F.3d 918, 921 (8th Cir. 2007) (noting that no conflict exists between an ability to follow only simple, concrete instructions and a GED reasoning level of three). But see Zavalin v. Colvin, 778 F.3d 842, 846-47 (9th Cir. 2015) (finding "an apparent conflict between the [RFC] to perform simple, repetitive tasks, and the demands of [GED level three] reasoning" based on claimant's cognitive abilities). After reviewing the record here, the Court reaches the same conclusion. A mail clerk position is classified as having an SVP of two and requiring unskilled work. See Dictionary of Occupational Titles, Code 209.687-026, 1991 WL 671813 (4th ed., 1991); see also AR. at 74. In turn, the applicable regulations define unskilled work as "work which needs little or no judgment to do *simple* duties that can be learned on the job in a short period of time." 20 C.F.R. § 404.1568(a) (emphasis added). More broadly, the Court sees little reason to doubt the ALJ's finding that plaintiff could perform work

with a GED level of three, which requires plaintiff be able to "apply commonsense understanding to carry out instructions furnished in written, oral, or diagrammatic form [and] [d]eal with problems involving several concrete variables in or from standardized situations." Dictionary of Occupational Titles, Code 209.687-026, 1991 WL 671813. Plaintiff's educational background and cognitive abilities - he graduated high school; bowls with friends on a semi-weekly basis; and cooks, cleans, and shops for himself - appear to equal those required by a GED reasoning level three. Accordingly, the Court sees no error in the ALJ's judgment here.

## Conclusion

The Commissioner's motion for judgment on the pleadings (Docket # 10) is **denied**, and plaintiff's motion for judgment on the pleadings (Docket # 9) is **granted** only insofar as remanding this matter back to the Commissioner for further proceedings consistent with the findings made in this Order.

**SO ORDERED.**

JONATHAN W. FELDMAN
United States Magistrate Judge

Dated:       March 24, 2016
             Rochester, New York

40